**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HENRENA JOHNSON, BARBARA DEMPS and JOHN MCCAULEY, Individually and as representatives of a class of similarly situated persons, on behalf of the PNC FINANCIAL SERVICES GROUP, INC. INCENTIVE SAVINGS PLAN, | Case No: 20-cv-01493-CCW |
| Plaintiffs | **AMENDED CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| THE PNC FINANCIAL SERVICES GROUP, INC., THE PNC FINANCIAL SERVICES GROUP, INC. INCENTIVE SAVINGS PLAN ADMINISTRATIVE COMMITTEE and DOES No. 1-10, Whose Names Are Currently Unknown, | |
| Defendants. | |

## I.   <u>INTRODUCTION</u>

1.     Plaintiffs, Henrena Johnson ("Johnson"), Barbara Demps ("Demps") and John McCauley ("McCauley") (collectively, "Plaintiffs"), as a participants in the PNC Financial Services Group, Inc. Incentive Savings Plan  ("Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participating employees, against Defendants, the PNC Financial Services Group, Inc. ("PNC"), the PNC Financial Services Group, Inc. Incentive Savings Plan Administrative Committee ("Administrative Committee"), and Does No. 1-10, who are members of the Administrative Committee or other fiduciaries of the Plan and whose names are currently unknown (collectively, "Defendants"), for breaches of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and related breaches of applicable law beginning six years from the date this action was originally filed and continuing to the date of judgment (the "Class Period").

2.     Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3.     The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.     As of December 31, 2019, the Plan had 65,410 participants with account balances and assets totaling approximately $6.9 billion, placing it in the top 0.1% of defined contribution plans by plan size.  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of defined contribution plans and the investment of defined contribution assets.  The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.     Defendants maintain the Plan and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, are obligated to (a) act for the exclusive benefit of participants, (b) ensure that the investment options offered through the Plan are prudent and diverse, and (c) ensure that Plan expenses are fair and reasonable.

6.      Defendants have breached their fiduciary duties to the Plan and, as detailed below, have allowed unreasonable recordkeeping/administrative expenses to be charged to the Plan throughout the Class Period (defined below).

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this action under ERISA Sections 404, 409 and 502, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class defined below (the "Class") as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiffs specifically seek the following relief:

    a.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

    b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

    c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

    d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

    e.      Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.      **THE PARTIES**

9.      Johnson is a former employee of PNC and is a current participant in the Plan under 29 U.S.C. § 1002(7).  Johnson is a resident of Jacksonville, Florida.

10.     Demps is a former employee of PNC and is a current participant in the Plan under 29 U.S.C. § 1002(7).  Demps is a resident of Jacksonville, Florida.

11.     McCauley is a former employee of PNC and a former participant in the Plan under 29 U.S.C. § 1002(7).  McCauley is a resident of Philadelphia, Pennsylvania.

12.     PNC is a Pennsylvania domestic corporation headquartered in Pittsburgh, PA.  PNC is a financial services company that provides retail and corporate banking and asset management.

13.     The Administrative Committee is the Plan administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at PNC's corporate headquarters in Pittsburgh, PA.  The Administrative Committee and its members are appointed by PNC to administer the Plan on PNC's behalf.

14.     Does No. 1-10 are the members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries to the Plan.  Plaintiffs are currently unable to determine the membership of the Administrative Committee or the identity of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Administrative Committee and the identity of any other fiduciaries is not publicly available.  As such, these defendants are named Does 1-10 as placeholders.  Plaintiffs will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Administrative Committee and other responsible individuals as defendants as soon as their identities are discovered.

### III.   JURISDICTION AND VENUE

15.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

17.      Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because PNC's principal place of business is in this District and the Plan is administered from this District.  Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

18.     Plaintiffs have standing to bring this action.  ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to the plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's excessive recordkeeping and administrative costs, among other injuries.

### IV.   FACTUAL ALLEGATIONS

A.   **Background And Plan Structure**

19.     The Plan is a single-employer 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching

contributions, any discretionary contributions, and earnings or losses thereon. The Plan pays Plan expenses from Plan assets, and substantially all administrative expenses are paid by participants as a reduction of investment income. Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses. The available investment options for participants of the Plan include various mutual funds, collective investment trusts and PNC common stock.

20.     Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities. Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC"). Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

21.     Collective trusts are, in essence, mutual funds without the SEC regulation. Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments. Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929. As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds. Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan. The main advantage of opting for a collective trust, rather than a mutual fund, is the amount of fees charged by collective trusts (for which larger retirement plans are eligible given their size) as a result of lesser regulatory requirements imposed on collective trusts, as compared to mutual funds, thereby resulting in collective trusts incurring lower administrative and related fees.

22.     The Plan operates, in part, as an employee stock ownership plan, which enables PNC employees to acquire an ownership interest in the company through units of the PNC Common Stock Fund.  The fund operates as a unitized fund, meaning participant accounts invest in units which represent a *pro rata* interest in the Plan's investment in PNC stock and cash or cash equivalents, which are held in a trust fund.  The PNC Common Stock Fund became frozen effective January 1, 2011.

23.     Alight Solutions LLC ("Alight") has served as the Plan's recordkeeper since mid-2017, when it was formed out of the benefits outsourcing business of Aon Hewitt.  Prior to this change, Hewitt Associates LLC ("Hewitt") was the Plan's recordkeeper.  As the recordkeeper, Alight is responsible for maintaining records with respect to employees' accounts in the Plan, effecting participant Plan investment elections, and performing administrative functions such as processing loan and withdrawal requests.

24.     During the Class Period, Plan assets were held in trust by PNC Bank.  All investments and asset allocations are performed through this trust fund.

**B.      The Defined Contribution Industry**

25.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness, such as those identified herein, have stark financial consequences for retirees.  Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.  Over time, even small differences in fees compound and can result in vast differences in the amount of savings available at retirement.  As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525, 135 S. Ct. 1823, 1825, 191 L. Ed. 2d 795 (2015).

26.     The impact of excessive fees on a plan's employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[1]

27.     Plan participants typically have little appreciation of the fees being assessed to their accounts.  Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in 401(k) plans, and 37% were unaware that they paid 401(k) fees at all.[2] It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and ensure fees remain reasonable for the services provided and properly and fully disclosed. Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans they administer.

**C.     Recordkeeping and Administrative Services**

28.     Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider to provide the essential recordkeeping and administrative services for the plan.  These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

---

[1] *A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf (last visited August 11, 2021).
[2] *See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf (last visited August 11, 2021).

29.     "Recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider, or "recordkeeper."

30.     There are two types of essential recordkeeping services provided by all national recordkeepers.  For large plans with substantial bargaining power (like the Plan), the first type is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

a.   Recordkeeping;

b.   Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

c.   Administrative services related to converting a plan from one recordkeeper to another;

d.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

e.   Maintenance of an employer stock fund (if needed);

f.   Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.   Plan consulting services, including assistance in selecting the investment lineup offered to participants;

h.  Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[3] (excluding the separate fee charged by an independent third-party auditor);

i.  Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

j.  Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

31.  The second type of essential recordkeeping services provided by all national recordkeepers often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants.  These fees are distinct from the bundled arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These services typically include the following:

a.  Loan processing;

b.  Brokerage services/account maintenance (if offered by the plan);

c.  Distribution services; and

d.  Processing of qualified domestic relations orders.

32.  All national recordkeepers have the capability to provide all of the aforementioned services to all large defined contribution plans, including those much smaller than the Plan.

---

[3]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

33.     For large plans with greater than 5,000 participants, any minor variations in the way that these essential services are delivered have no material impact on the fees charged by recordkeepers to deliver the services.  That fact is confirmed by the practice of all service providers quoting fees on a per-participant basis without regard for any individual differences in services requested -- which are treated by the service providers as largely immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective.

34.     While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all actually offer the same bundles and combinations of services as their competitors.  Accordingly, the market for defined contribution plan recordkeeping services has become increasingly price competitive, particularly for larger plans that, like the Plan, have a considerable number of participants and significant assets.

35.     The marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  As a plan's participant count increases, the recordkeeper's fixed costs of providing recordkeeping and administrative services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.

36.     Crucially, the average cost to a recordkeeper of providing services to a participant does not hinge on that participant's account balance.  In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does one with a balance of $1,000,000.  Prudent plan fiduciaries are aware of this cost structure dynamic.  Understanding this, prudent fiduciaries of large plans (like the Plan) will therefore leverage the plan's participant count to obtain lower effective per-participant fees.

37.     Because recordkeeping fees are paid in dollars, prudent fiduciaries evaluate the fees for recordkeeping services on a dollar-per-participant basis.  This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

38.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider.  Recognizing that recordkeeping and administrative services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a quote.  These fee quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

39.     Having received quotes, if necessary, a prudent fiduciary can then negotiate with its current provider for a lower fee or move to a new provider to provide the same (or better) services for a competitive (or lower) reasonable fee.  This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

40.     After negotiating the fee to be paid to the recordkeeper, and electing to have the plan (*i.e.*, participants) pay that fee, the fiduciaries can allocate the negotiated fees among participant accounts at the negotiated per-participant rate, or *pro rata* based on participant account balances, among other less common ways.

D.   **Defendants' Breaches of Fiduciary Duties**

41.    As discussed in detail below, Defendants have severely breached their fiduciary

duties of prudence and loyalty to the Plan.  Plaintiffs did not acquire actual knowledge regarding

Defendants' breaches at issue here until shortly before the original Complaint (ECF No. 1) was

filed.

1.    **The Plan's Excessive Recordkeeping/Administrative Costs**

42.    An obvious indicator of Defendants' breaches of their fiduciary duties is the

Plan's excessive recordkeeping and administrative costs.  The Plan allocates these expenses *pro*

*rata*, meaning they are deducted directly from participant accounts as a percentage of the account

balance.  The impact of such high fees on participant balances is aggravated by the effects of

compounding, to the significant detriment of participants over time.  This effect is illustrated by

the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by

fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



43.    During the Class Period, participants paid for the recordkeeping and

administrative services provided by Alight, and Hewitt before it, directly through fees deducted

from their accounts.  The Plan did not compensate Alight or Hewitt through any revenue sharing

or other indirect methods of payment.  Accordingly, the direct fees remitted to the Plan's

recordkeeper represented the total charge to the Plan for recordkeeping services.  These services

provided to the Plan are and were the same standard recordkeeping and administrative services

identified above, and those provided to comparable plans.  There are no services provided to the

Plan and its participants by Alight or Hewitt that are unusual or out of the ordinary.

44.     The direct amounts extracted from participant accounts to compensate

Alight/Hewitt for recordkeeping services from 2014 to 2019 (the most recent year for which data

is available) were as follows:

**Table 1**

| Year | Participants | Direct Recordkeeping Fee | Per-Participant Recordkeeping Fee |
|------|--------------|--------------------------|-----------------------------------|
| 2014 | 59,547 | $3,381,822 | $56.79 |
| 2015 | 63,847 | $3,334,728 | $52.23 |
| 2016 | 63,508 | $3,501,368 | $55.13 |
| 2017 | 64,829 | $3,524,327 | $54.36 |
| 2018 | 66,032 | $3,366,891 | $50.99 |
| 2019 | 65,410 | $3,037,204 | $46.43 |
| **AVG** | **63,862** | **$3,357,723** | **$52.58** |

45.     Given the Plan's size and resulting negotiating power, with prudent management

and administration, the Plan should have unquestionably been able to obtain recordkeeping and

administrative services for significantly lower than the above amounts per participant.  Table 2

below, showing recordkeeping fees paid to Alight by similarly large, but still significantly

smaller plans (by participant count) than the Plan, indicates the substantial savings available to

the Plan during the Class Period.  The fees in the table are apples-to-apples comparisons in that

they include all the fees being charged by Alight[4] to provide the same recordkeeping and administrative services to similar defined contribution plans.

46.     The recordkeeping fees calculated[5] for each plan below include all the direct compensation paid to the recordkeeper disclosed on the plan's Form 5500, as well as the appropriate indirect compensation.  Specifically, if the plan's pricing structure as described in each plan's Form 5500 reveals that some or all of the revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the recordkeeping fees.  In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the recordkeeping fees.  In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.

---

[4]The plans cited in Table 2 have all engaged the same recordkeeper as the Plan to provide the same services, thereby demonstrating the substantially reduced amounts the Plan could have paid for the same services throughout the Class Period to the incumbent service provider.  A similar comparison of comparable plans engaging other national recordkeepers, which are all capable of providing the same level and quality of services, would show similar or lower obtainable fees (further establishing the nature of the breaches at issue).

[5]Fee calculations are based on 2018 Form 5500 information, or the most recent Form 5500 if 2018 is unavailable. The recordkeeping services obtainable from Alight (and its predecessor), as well as other national recordkeepers, have been the same or materially similar throughout the pertinent period (*i.e.*, since 2014), meaning that the Plan could have achieved similar pricing in each year since 2014.

**Table 2**

| Plan | Participants | Assets | RK Fee | Recordkeeping Price/ Participant | Recordkeeper |
|------|------------|--------|--------|----------------------------------|--------------|
| The Rite Aid 401(k) Plan | 31,330 | $2.668B | $1,040,153 | $33.20 | Alight |
| Advocate Health Care Network Retirement Savings Plan 401(k) | 44,893 | $2.955B | $1,421,458 | $31.66 | Alight |
| Proctor & Gamble Profit Sharing Trust & Employee Stock Ownership Plan | 53,048 | $17.465B | $1,680,893 | $31.69 | Alight |
| UPMC 403(b) Retirement Savings Plan | 53,206 | $2.140B | $1,326,123 | $25.30 | Alight |
| **PNC Financial Services Group, Inc. Incentive Savings Plan** | **66,032** | **$5.676B** | **$3,366,891** | **$50.99** | **Alight** |

47.     As the table above indicates, the fees paid by the Plan to the same recordkeeper for virtually the same package of services are much higher than those of plans with comparable, but smaller, participant counts.  Indeed, the average recordkeeping fee paid by the Plan ($52.58 per participant) is even further removed from what other plans have contracted to pay Alight.  By these data points, as of 2014, the Plan should have refused to pay any more than $25 per participant for recordkeeping services if Defendants had taken their responsibilities seriously and fulfilled their duties to ensure that the Plan paid only reasonable expenses to its service providers.  Moreover, given the Plan's significantly greater size (approximately 13,000 more participants) than its closest comparator in the table above (UPMC), Defendants necessarily should have negotiated for a fee even lower than the $25 per head that the UPMC plan paid.

Instead, the Plan paid, on average, at least double the going rate for the same quality and level of services to *the same recordkeeper*.

48.     Defendants clearly failed to scrutinize the prevailing rates for the recordkeeping services the Plan received, and for which participants shoulder the financial responsibility to the detriment of their retirement savings.  Indeed, the actual market data points presented in Table 2 represent the starting point that Defendants should have used in negotiations with Alight.

49.     Based on fees paid by other large plans receiving the exact same recordkeeping and administrative services and using the exact same service provider, it is reasonable to infer that the Plan fiduciaries failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.  In light of the amounts remitted to Alight throughout the Class Period, Defendants clearly either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping and administrative fees of the Plan to those of other similarly sized defined contribution plans, or were complicit in paying grossly excessive fees.

50.     Upon information and belief, Defendants neglected to seek quotes from other recordkeepers and engage in processes to evaluate the reasonableness of the Plan's recordkeeping fees.  Had Defendants done so in any reasonably competent manner, they would have concluded that the fees the Plan was paying were unreasonable and excessive relative to the services received.

51.     In addition to the recordkeeping fees paid to Alight, and Hewitt before it, during the pertinent period, the Plan also paid out annual administrative fees to its legal counsel, its auditor, Alight Solutions Financial Advisors, LLC (formerly Aon Hewitt Financial Advisors, LLC) for investment advisory services, and Cambridge Associates LLC and Towers Watson and Co. for pension consulting services.  Moreover, Defendants also caused the Plan to compensate

PNC Financial Services, at an average of nearly $227,000 per year from 2014 to 2019, purportedly for "certain administrative services" performed as the Plan Administrator.  All of these payments added up to significant additional costs, and combined with the recordkeeping fee, represented unnecessarily excessive expenses to Plan participants.

52.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged for recordkeeping and administrative services and their failure to take effective remedial actions amounts to a shocking breach of their fiduciary duties to the Plan.  To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for recordkeeping.  Had Defendants appropriately monitored the compensation paid to Alight and Hewitt and ensured that participants were only charged reasonable recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

### V.     ERISA'S FIDUCIARY STANDARDS

53.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of
>
>> (i)     providing benefits to participants and their beneficiaries; and
>> (ii)     defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

54.   Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

55.   Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

56.   ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.  *Donovan v. Bierwirth*, 680 F.2d 263, 271-72, n.8 (2d Cir. 1982); *accord Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019).

57.   ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)   if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

58.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.     CLASS ALLEGATIONS

59.     This action is brought as a class action by Plaintiffs on behalf of herself and the following proposed Class:

> All participants and beneficiaries in the PNC Financial Services Group, Inc. Incentive Savings Plan (the "Plan") at any time on or after October 2, 2014 to the present (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

60.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

61.     **Numerosity**.  Plaintiffs are informed and believes that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

62.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)      Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)      Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)      Whether and what form of relief should be afforded to Plaintiffs and the Class.

63.      **Typicality**.  Plaintiffs, who as members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

64.      **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

65.      **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

66.   **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages incurred by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

67.   **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

68.   **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

69.   Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

70.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

71.     Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3).

<u>**COUNT I**</u>
**(For Breach of Fiduciary Duty)**

72.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

73.     Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

74.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in

(or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

75.     As a direct result of Defendants' breaches of fiduciary duties, the Plan has suffered losses and damages.

76.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

77.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

78.     PNC is responsible for appointing, overseeing, and removing members of the Administrative Committee.

79.     In light of its appointment and supervisory authority, PNC had a fiduciary responsibility to monitor the performance of the Administrative Committee and its members.

80.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

81.     To the extent that fiduciary monitoring responsibilities of PNC was delegated, its

monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

82.     PNC breached its fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)   Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

83.     As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had PNC discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized and/or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

84.     PNC is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count; to restore to the Plan any profits made through use of Plan assets; and is subject to other equitable or remedial relief as appropriate.

85.     Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches.  Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT III**
**(In the Alternative, Liability for Participation In Breach of Fiduciary Duty)**

86.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

87.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust.

88.     To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to pay unreasonable administrative and recordkeeping fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

-26-

(b)      Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)      Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)      Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)      Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial with respect to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: August 17, 2021

/s/ Gary Lynch
Carlson Lynch LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
Email: glynch@carlsonlynch.com

James E. Miller
Laurie Rubinow
Miller Shah LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100

Facsimile: (866) 300-7367
Email: jemiller@millershah.com
          lrubinow@millershah.com

James C. Shah
Alec J. Berin
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
          ajberin@millershah.com

Kolin C. Tang
Miller Shah LLP
1401 Dove Street, Suite 510
Newport Beach, CA 92660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: kctang@millershah.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*