IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN MCCAULEY, | ) |
|                 Plaintiffs, | )    **2:20-CV-01493-CCW** |
| v. | ) |
| THE PNC FINANCIAL SERVICES GROUP, INC., THE PNC FINANCIAL SERVICES GROUP, INC INCENTIVE SAVINGS PLAN ADMINISTRATIVE COMMITTEE, DOES NO. 1 -10, | ) |
|                 Defendants. | ) |

## **OPINION**

Plaintiff John McCauley claims that Defendants PNC Financial Services Group, Inc. and PNC Financial Services Group, Inc. Incentive Savings Plan Administrative Committee (collectively "PNC") violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, when they paid excessive recordkeeping fees for their employees' Incentive Savings Plan. ECF No. 42. PNC now moves for summary judgment on all claims and seeks to exclude Mr. McCauley's expert witness. ECF Nos. 101, 111. For the following reasons, the Court will grant both of PNC's Motions.

### I.    Material Facts

The following facts are drawn from the parties' consolidated factual statements and responses, which appear at ECF No. 143, and are undisputed unless otherwise noted.

Defendant PNC Financial Services Group, Inc. sponsors the Incentive Savings Plan (the "Plan"), which is a defined contribution retirement plan funded through employee contributions

and matching employer contributions. ECF No. 143 ¶ 1. The Plan is open to nearly all U.S.-based salaried and hourly employees of PNC, including Plaintiff John McCauley. *Id.* ¶ 2. The employees that participate in the Plan may choose how to invest the contributions among a variety of professionally managed funds. *Id.* ¶ 3.

On September 1, 2007, PNC hired the recordkeeper company, Alight, to provide support and other services to the Plan's participants. *Id.* ¶¶ 4–6. Alight charged the Plan a flat dollar amount per participant for its core services. *Id.* ¶ 8. It then charged additional fees for certain participant-elected services, such as loan processing and qualification of domestic relations orders. *Id.* ¶ 8. Alight never received fees from PNC or the Plan that were calculated as asset-based fees. *Id.* The Plan allocated the cost of Alight's recordkeeping services to participants' individual accounts on a pro-rata "asset-based" charge. *Id.* ¶ 9. In 2014, the Plan's base recordkeeping fee was $46.55 per participant, and it declined to $32.00 per participant by January 1, 2022. *Id.* ¶ 63.

On August 17, 2021, Mr. McCauley filed an Amended Complaint against PNC, contending that, from October 2, 2014 to the present, it breached its fiduciary duty of prudence by failing to properly monitor these recordkeeping fees (Count I), that it failed to monitor fiduciaries and co-fiduciary breaches (Count II), and alternatively, that it is liable for participating in the breach of fiduciary duties (Count III). ECF No. 42 at 23–26. To support his claims, Mr. McCauley engaged Mr. Ty Minnich as an expert witness. ECF No. 143 at ¶ 66. On May 17, 2023, Mr. Minnich submitted his Expert Report which evaluated the Plan's recordkeeping fees, estimated the reasonable market rate for such fees, and calculated Plaintiffs' damages for paying allegedly excessive fees. ECF No. 102, Ex. A. On August 30, 2023, Mr. Minnich filed a Supplemental Expert Report on the same topics. ECF No. 102, Ex. C.

In his Supplemental Report, Mr. Minnich explains that he has 30 years of experience as a financial services professional, during which he specialized in 401(k) and 403(b) retirement plans and the applicable fiduciary duties. ECF No. 102, Ex. C at 5. For the past 15 years, he has been responsible for overseeing and conducting requests for proposals ("RFPs") and pricing processes in the industry. *Id.* Mr. Minnich opines that PNC "failed to act consistent with industry standards and custom applicable to fiduciaries…" thereby causing "the Plan to pay recordkeeping and administrative fees in excess of the reasonable market rate." *Id.* at 6. Mr. Minnich contends that the reasonable market rate for the Plan's recordkeeping and administrative services was $22.00 for 2014–2016, $20.00 for 2017–2019, and $19.00 for 2020–2022. *Id.* at 7. Based on this estimated reasonable market rate, Mr. Minnich calculates that the Plan lost a total of $25,122,442 for paying excessive recordkeeping fees. *Id.*

PNC disputes Mr. Minnich's conclusions and seeks to exclude him as an expert witness, *see* ECF No. 101, in addition to moving for summary judgment on Mr. McCauley's claims, *see* ECF No. 111. With briefing complete, the Motions are now ripe for adjudication.

**II.    PNC's Motion to Exclude the Expert Testimony of Ty Minnich, ECF No. 101**

Mr. McCauley seeks to introduce Ty Minnich as an expert witness who would provide opinions on the following topics: (1) whether Alight charged excessive recordkeeping and administrative fees; (2) what the reasonable market rate for the Plan's services would be; and (3) the amount of plaintiffs' damages. ECF No. 102, Ex. A, Ex. C. PNC seeks to exclude Mr. Minnich's expert testimony, arguing that it is not reliable because his opinion is based solely on his experience "without [using] any reproduceable or traceable process." ECF No. 102 at 5. In response, Mr. McCauley contends that Mr. Minnich's expert opinion is reliable because it is based

on decades of experience in the industry and a "thoroughly-explained and supportable analytical framework." ECF No. 125 at 5–6.

## A. Legal Standard

Under Rule 702, a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify if the proponent demonstrates to the court that it is more likely than not that:" (a) their expertise would "help the trier of fact to understand the evidence or to determine a fact in issue"; (b) the opinion "is based on sufficient facts or data"; (c) the opinion "is the product of reliable principles and methods"; and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." F.R.E. 702; *Daubert*, 509 U.S. at 597. Consistent with Rule 702, *Daubert* teaches that district courts have a "'gatekeeping' obligation to [e]nsure that only reliable and relevant expert testimony be presented to jurors." *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 112 (3d Cir. 2020). In discharging this obligation, the court "must ensure that expert testimony satisfies a 'trilogy of restrictions': qualification, reliability, and fit." *Id.* (quoting *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)). Ultimately, "[t]he overriding consideration with regard to these three requirements is that expert testimony should be admitted if it will assist the trier of fact. *Id.* (citing *United States v. Velasquez*, 64 F.3d 844, 850 (3d Cir. 1995)).

## B. The Court will Exclude the Expert Testimony of Ty Minnich

### i. Mr. Minnich's Opinion on the Reasonable Market Rate

PNC first contends, and the Court agrees, that Mr. Minnich's opinions regarding a reasonable market rate are not based on a reliable methodology. Mr. Minnich asserts that he based his expert opinion on his industry experience and three pertinent factors: participant count, the services provided, and any ancillary revenue. ECF No. 102, Ex. A at 9–10, Ex. C at 9–10. He

4

maintains that the first factor is the most important, explaining that "[w]hen the number of participants increase, the necessary recordkeeping fees would exponentially decline." *Id.* at 9. He further notes that in his industry experience, recordkeepers often create a pricing curve based on participant count and per person fees to determine the reasonable market rate. *Id.* Mr. Minnich, however, did not create a pricing curve in this case. *See generally* ECF No. 102, Ex. A, Ex. C; ECF No. 102, Ex. B at 63:9-24.

Regarding the second factor, Mr. Minnich opined that the Plan received no services out of the ordinary that would have contributed to an increased price. ECF No. 102, Ex. A at 10, Ex. C at 10. And for the third factor, Mr. Minnich explained that an affiliate of the Plan's recordkeeper received over $2.2 million in direct compensation in 2020. *Id.* at 11. Mr. Minnich noted that this additional revenue stream meant that the recordkeeper "would likely have provided [] services to the Plan for substantially less throughout the Class Period had the Plan fiduciaries negotiated to achieve the reasonable market rate." *Id.* Mr. Minnich, however, does not explain whether the recordkeeper received additional revenue in years other than 2020, and by how much exactly this compensation would have decreased the per person fees paid. *Id.*

Here, it appears that Mr. Minnich's opinions are based on his subjective belief and experience and, therefore, he has not demonstrated that it is more likely than not that his testimony is the product of reliable principles and methods. *See Tyger*, 832 F. App'x at 112 (explaining that an expert opinion must "be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"); FRE 702(4) (reaffirming the Court's gatekeeping role in ensuring that the proponent of expert testimony shows it is more likely than not that the "expert's opinion reflects a reliable application of the principles and methods to the facts of the case."). In his Report, Mr. Minnich describes three important factors when calculating

a reasonable fee, but he does not indicate how—aside from his experience—he used these to arrive at a reasonable fee. *See Sellers v. Trs. of Bos. Coll.*, No. 10912, 2024 WL 1586755, at *30 (D. Mass. Apr. 11, 2024) (excluding portions of Mr. Minnich's expert testimony because there was "no indication as to how he applie[d] any methodology to calculate a reasonable fee.").

Indeed, when asked specifically how he applied his experience to derive his reasonable fee calculation, Mr. Minnich responded that:

> You take all relevant information, review services agreements, understand if there are any enhanced service requirements that couldn't be fulfilled through a competitive bidding environment, having done it hundreds of times, and look at the participant count as the initial phase, understand the services agreements and what needs to be done to fulfill that, and then look at the plan dynamics relative to ancillary revenue capabilities.
>
> When I did that, I determined that the fees were reasonable at the level that I put forth.

ECF No. 102, Ex. B at 114:1-19. Mr. Minnich further explained that after having "done it for many, many years and running the business, I know what the relative reasonable fee is for the period of time in question." *Id.* at 115:2-18. Based on this deposition testimony and his Expert Report, Mr. Minnich conclusorily states that, based on his experience and these three factors, his proffered rates were reasonable. *See Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2019 WL 4735876, at *10 (S.D.N.Y. Sept. 27, 2019) (excluding Mr. Minnich's expert testimony because he stated "in a conclusory fashion" what the reasonable fees were but did not explain how his experience led to this conclusion). Mr. Minnich did not create a pricing curve—despite indicating this is the industry norm—nor could he point to any other reliable methodology or scientific procedure he used to calculate his reasonable fees. *See generally* ECF No. 102, Ex. A, Ex. B; ECF No. 125, Ex. A.

6

Mr. Minnich's Report also points to four other retirement plans that he believes are comparable to the Plan and demonstrate that PNC "could have negotiated far lower recordkeeping fees…" ECF No. 102, Ex. A at 14, Ex. C at 14. The Court finds, however, that these four comparator plans do not salvage the reliability of Mr. Minnich's opinion. First, Mr. Minnich acknowledges that the comparator plans "were not used as part of [his] pricing, analytic decision on what a reasonable fee was." ECF No. 102, Ex. B at 233:3-19. Instead, he provided them "as supporting documents to illustrate examples of other plans." *Id.* The Court finds that such plans do not support the reliability of Mr. Minnich's testimony. It appears that after Mr. Minnich determined the reasonable market fee, he then picked these plans to support his reasonable fee determination. *See Cunningham*, 2019 WL 4735876, at *10 (finding that Mr. Minnich offered no explanation as to how he chose his comparator plans and explaining that they just "happen to be indicative of the analytic components [he] was looking at to come up with the reasonable fee.").

Moreover, in cases where courts admitted Mr. Minnich's expert testimony, they highlighted how Mr. Minnich chose his comparator plans and why they support his reasonable fee calculation. For example, in *Munro v. Univ. of S. Cal.*, No. 2:16-cv-06191, 2022 WL 16955481, at *5–7 (C.D. Cal. Nov. 1, 2022), Mr. Minnich compiled a list of similarly-sized comparator plans, identified their per person fees, plotted the fee and size information on a pricing curve, then used this curve to determine the reasonable fee. *See also Vellali v. Yale Univ.*, No. 3:16-cv-1345, 2022 WL 968555, at *3 (D. Conn. Mar. 30, 2022) (explaining that Mr. Minnich chose his comparators based on several factors, including similar plan size, similar due diligence, and recently adopting a new per person fee, then plotting these comparators on a pricing curve). Unlike in *Munro*, where the Court found that Mr. Minnich did not cherry pick the comparators because he chose them based on participant count and not their fee, Mr. Minnich appears to have done the opposite here: he

7

selected comparators with fees that supported his calculation. *See* ECF No. 102, Ex. B at 111:14–112:19 ("Q. And [what] was the reason you included those publicly available datapoints in your report…? A. Step 2 was not to look at other plans to determine what a reasonable fee was. The comparator plans are simply an indication of other plans in the marketplace with comparable fees. Its – it's to support, to some extent, what I've put forth."). Therefore, the Court finds that Mr. Minnich's comparator plans do not support that his methodology was reliable.

Accordingly, because Mr. Minnich has failed to identify a reliable methodology or process he used to calculate the reasonable market fee, the Court finds that his expert opinion regarding this topic should be excluded.

### ii. Mr. Minnich's Opinion as to the Amount of Damages

In his Expert Report, Mr. Minnich further opines that, based on his reasonable fee calculations, the amount of damages in this case is $25,122,422. ECF No. 102, Ex. A, Ex. C. But because Mr. Minnich's reasonable fee calculation is based on an unreliable methodology, the Court finds that his opinion as to the amount of damages is also unreliable and should be excluded.

Accordingly, the Court will grant PNC's Motion to Exclude Mr. Minnich's testimony.

### III.   PNC's Motion for Summary Judgment, ECF No. 111

PNC argues that Mr. McCauley cannot point to sufficient facts in the record from which a reasonable factfinder could conclude that PNC breached its fiduciary duty of prudence and caused a loss to the Plan. ECF No. 112 at 13. In support, PNC notes that the Committee prudently monitored the Plan's recordkeeping fees through quarterly meetings, benchmarking studies, and an RFP. ECF No. 112 at 13–17. PNC further argues that Mr. McCauley cannot point to evidence showing loss causation because Mr. Minnich's expert opinions are inadmissible. ECF No. 112 at 21–24. In response, Mr. McCauley argues that he has proffered sufficient evidence to show that

the Committee breached its duty of prudence: namely, that the Committee improperly delegated the responsibility to monitor recordkeeping fees to a non-fiduciary plan manager who provided insufficient quarterly reports, commissioned ineffective benchmarking studies, and delayed holding an RFP. ECF No. 129 at 11–22. Furthermore, as evidence that this alleged breach caused a loss to the Plan, Mr. McCauley first points to Mr. Minnich's expert opinion as evidence, and then asserts that it is PNC who bears the burden of showing that the fiduciary breach did not cause a loss to the Plan. ECF No. 129 at 24–25.

### A. Legal Standard

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (alteration omitted) (quoting *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The burden to establish that there is no genuine dispute as to any material fact "remains with the moving party regardless of which party would have the burden of persuasion at trial." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (internal quotation marks omitted). Furthermore, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's

evidence is insufficient to carry that burden.'" *Kaucher v. Cnty. Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87.  Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial,'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted).  But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor . . . to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence…." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations omitted).  Instead, "there must be evidence on which the jury could reasonably find for the non-movant." *Id.* (cleaned up).

    **B.**    **The Court will Grant PNC's Motion for Summary Judgment**

Under ERISA, the elements of a breach of fiduciary duty claim are as follows: "'(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan.'" *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (2019) (quoting *Leckey v. Stefano*, 501 F.3d 212, 225–26 (3d Cir. 2007)). In its Motion, PNC contests the second and third elements.  ECF No. 112 at 13.  To prevail in a duty-of-prudence case under ERISA, a plaintiff must demonstrate that a plan fiduciary failed to both (1) engage in objectively prudent conduct "in arriving at [its] investment decision[s]," and (2) make decisions that "led to objectively prudent investments." *Renfro v. Unisys Corp.*, 671 F.3d

314, 322 (3d Cir. 2011). Here, the Court need not address whether PNC breached its duty of prudence because the Court finds that Mr. McCauley has failed to point to sufficient evidence from which a factfinder could conclude that a breach of fiduciary duties caused a loss to the Plan.

To show loss to the plan, "ERISA requires a causal connection between the breach of fiduciary duty and the alleged loss to the Plan." *Stanford v. Foamex, L.P.*, 822 F. Supp. 2d. 455, 478 (E.D. Pa. 2011) (citing *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 160 (3d Cir. 1999)). The party bearing the burden of persuasion on causation, however, varies between circuits. Some courts require the plaintiff to prove both loss and causation, while others require the plaintiff to demonstrate a prima facie case of loss before shifting the burden to the fiduciary to prove that the loss was not caused by the breach of fiduciary duty. *See In re Unisys*, 173 F.3d at n. 23 (citing circuit cases). The Third Circuit has not yet addressed which party bears the burden of persuasion on causation. *Id.* This Court, however, need not decide that issue because, under either analysis, Mr. McCauley has failed to provide evidence sufficient to establish a prima facie case of loss.

Here, Mr. McCauley relies solely on Mr. Minnich's Expert Report to establish a prima facie case of loss. ECF No. 129 at 22–25 ("[T]he Minnich Report more than sufficiently establishes both damages and causation."); ECF No. 143 ¶ 112 (citing only Mr. Minnich's expert report to show damages and causation). And because the Court ruled Mr. Minnich's expert opinion inadmissible, Mr. McCauley cannot establish loss. *See Cunningham*, 2019 WL 4735876, at *7 (excluding plaintiff's expert witness then granting defendant's summary-judgment motion because plaintiff was unable to demonstrate a material issue of fact as to loss without the expert's testimony). Therefore, the Court will grant summary judgment for PNC on Count I for breach of fiduciary duty because, viewing the facts in the light most favorable to Mr. McCauley, he has not shown a material issue of fact as to loss causation.

11

Furthermore, Mr. McCauley brings claims regarding the failure to monitor fiduciaries (Count II) and liability for participation in breach of fiduciary duty (Count III), both of which stem from the breach-of-fiduciary-duty claim in Count I. ECF No. 42. Both parties agree that Mr. McCauley's claims in Count II and III are dependent on his claims in Count I. ECF Nos. 112 at 24–25; 129 at 25. Therefore, because the Court will grant summary judgment for PNC on Count I, it will also enter summary judgment for PNC on the claims in Counts II and III.

Accordingly, the Court will grant PNC's Motion for Summary Judgment.

## IV.     Conclusion

For the foregoing reasons, PNC's Motion for Summary Judgment and Motion to Exclude the Expert Testimony of Mr. Minnich will be GRANTED.

DATED this 21st day of June, 2024.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record